**James COSTELLO and Aron Moore, Plaintiffs,**

v.

**HOME DEPOT USA, INC., Defendant.**

**Civil Action No. 3:11–CV–953 (JCH).**

United States District Court,
D. Connecticut.

March 5, 2013.

Caitlin Duffy, Olimpio Lee Squitieri, Squitieri & Fearon, New York, NY, Mark P. Kindall, Robert A. Izard, Jr., Izard Nobel, LLP, West Hartford, CT, for Plaintiffs.

RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO JAMES COSTELLO (Doc. No. 93) AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO ARON MOORE (Doc. No. 98) [1]

JANET C. HALL, District Judge.

## I. INTRODUCTION

Plaintiffs James Costello and Aron Moore bring this action against defendant Home Depot U.S.A., Inc. ("Home Depot"), alleging that they were not paid for overtime work in violation of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 207. Home Depot simultaneously filed these Motions for Summary Judgment as to Costello (Doc. No. 93) and Moore (Doc. No. 98), arguing that there was no violation of the FLSA because both former employees were properly categorized as exempt as executive employees from the FLSA's rules governing overtime payments.

For the following reasons, the Motions for Summary Judgment are denied.

## II. STANDARD OF REVIEW

A motion for summary judgment "may properly be granted ... only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir.2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Id.* In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir.2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir.2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth' specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed.R.Civ.P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007)); *see also Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 163 (2d Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## III. FACTUAL BACKGROUND

This case has a somewhat convoluted procedural history. In 2004, two separate federal actions were filed alleging that Home Depot violated the FLSA with re-

---

1. The plaintiffs have also filed a Motion for Partial Summary Judgment (Doc. No. 90) as to the proper method of calculating overtime in this case. On October 12, 2012, the court granted a Motion (Doc. No. 104) to adjourn the briefing schedule for that Motion for Partial Summary Judgment, pending the resolution of the two Motions for Summary Judgment considered here. As such, the court does not deal with the merits of that Motion in this Ruling.

gard to merchandising assistant store managers ("MASMs"). These cases were consolidated, and the district court subsequently granted a collective action certification. *See Aquilino v. Home Depot, U.S.A., Inc.,* No. 04–04100, 2011 WL 564039, *1 (D.N.J.2011) (summarizing history). However, in February 2011, the district court decertified the collective action. *Id.* at *12. Separate multiple-plaintiff actions followed, including the present action. Several of the original plaintiffs in this action were voluntarily dismissed, others were severed and transferred to other districts following an Order of this court (Doc. No. 72). The only remaining plaintiffs in this action are James Costello and Aron Moore.

Home Depot operates large, warehouse-style retail stores that sell home improvement products and services. *See* Defendant's Local Rule 56(a)(1) Statement Regarding James Costello ("Def.'s 56(a)(1), Costello") at ¶ 1; Plaintiff James Costello's Local Rule 56(a)(2) Statement ("Costello 56(a)(2)") at ¶ 1. Home Depot stores are staffed by one Store Manager and up to seven Assistant Store Managers, a group that includes MASMs. Def.'s 56(a)(1), Costello at ¶ 2; Costello 56(a)(2) at ¶ 2. MASMs are the second-highest-ranking employees in Home Depot stores, subordinate only to the Store Manager. *Id.* The stores are divided into up to eleven core merchandising departments: Lumber, Building Materials, Flooring, Paint, Hardware, Plumbing, Electrical, Garden, Kitchen & Bath, Millwork, and Decor. Def.'s 56(a)(1), Costello at ¶ 3; Costello 56(a)(2) at ¶ 3.

MASMs and Specialty ASMs oversee from one to eleven merchandising departments. Def.'s 56(a)(1), Costello at ¶ 4; Costello 56(a)(2) at ¶ 4; Plaintiff Aron Moore's Local Rule 56(a)(2) Statement ("Moore 56(a)(2)") at ¶ 4. Merchandising departments are staffed by sales associates and one department supervisor. *Id.* MASMs supervise the department supervisors and associates assigned to their departments. *Id.* Costello and Moore dispute whether all of the departments they were assigned to also had an assigned department supervisor, and they maintain that the department supervisors are primarily responsible for supervision of associates in that department. Costello 56(a)(2) at ¶ 4; Moore 56(a)(2) at ¶ 4. The MASM job description states that, among other responsibilities, MASMs are responsible for "[m]aintaining department profitability," "provid[ing] leadership to Associates," and "[s]etting store objectives and ensuring [that] they are met." Def.'s 56(a)(1), Costello at ¶ 5; Costello 56(a)(2) at ¶ 5.

### A. James Costello

Costello was hired as a sales associate by Home Depot in March 1997. Def.'s 56(a)(1), Costello at ¶ 6; Costello 56(a)(2) at ¶ 6. On July 29, 2002, Costello was promoted to the MASM position. Def.'s 56(a)(1), Costello at ¶ 7; Costello 56(a)(2) at ¶ 7. Before his promotion, Costello went through a retail management assessment and training program. *Id.* The parties dispute exactly what the training entailed or whether Costello received continuous training as an MASM, but agree the training included review of a Home Depot manual that covered various parts of store operations. *Id.*

Costello began working as an MASM in Westerly, Rhode Island in July 2002, and was transferred as an MASM to a store in Waterford, Connecticut in September 2003, where he remained, with the exception of a temporary reassignment to a store in Lisbon, Connecticut, until his employment ended on January 1, 2006. Def.'s 56(a)(1), Costello at ¶ 8; Costello 56(a)(2) at ¶ 8. At the Westerly store, Cos-

tello was assigned to the Lumber, Millwork, Building Materials, Hardware, Pro Desk, and Tool Rental Center departments, and for a short time, the Front Desk. Def.'s 56(a)(1), Costello at ¶ 9; Costello 56(a)(2) at ¶ 9. The Pro Desk, Hardware, and Rental Center departments each had department supervisors, and there was a fourth department supervisor who managed the Lumber, Building Materials, and Millwork departments. *Id.* These four department supervisors reported to Costello. *Id.* When Costello was assigned to the Front Desk, an additional supervisor reported to him. *Id.* A disputed number of other employees, including associates, also worked in the store. *Id.*

At the Waterford store, Costello was assigned to the Lumber, Building Materials, Millwork, and Hardware departments. Def.'s 56(a)(1), Costello at ¶ 10; Costello 56(a)(2) at ¶ 10. The department supervisor for those four departments reported to Costello. *Id.* At the Lisbon store, Costello was responsible for the Hardware, Pro Desk, Lumber, and Millwork departments, each of which had its own department supervisors, who reported to Costello. Def.'s 56(a)(1), Costello at ¶ 11; Costello 56(a)(2) at ¶ 11.

Costello resigned from Home Depot on either December 29, 2005 or January 1, 2006, and this resignation occurred around the time allegations by female employees were made against him. Def.'s 56(a)(1), Costello at ¶ 12; Costello 56(a)(2) at ¶ 12. Home Depot claims that an investigation was performed relating to the complaints and that Costello was found to have violated the company's Code of Conduct and his employment was terminated. Def.'s 56(a)(1), Costello at ¶ 12; Costello 56(a)(2) at ¶ 12.

The MASM job description states that the major tasks and responsibilities of the position include, "[r]ecruiting, interviewing applicants and making recommendations to the Store Manager about hiring for open positions." Def.'s 56(a)(1), Costello at ¶ 14; Costello 56(a)(2) at ¶ 14. When assigned to the Westerly store, Costello assisted in preparing the store for its grand opening and was involved in hiring staff. Def.'s 56(a)(1), Costello at ¶ 15; Costello 56(a)(2) at ¶ 15. Costello conducted 200 or 300 interviews and asked candidates about their product knowledge, departmental preferences, and previous experience. *Id.* He made recommendations to the store manager or human resources manager about who should be hired based on his interviews, and at least some of these candidates were hired. *Id.* Costello was then part of a group that was involved in deciding where the new employees would be placed and what salary they would be offered. *Id.* Costello claims that the final hiring decisions were made by the store manager or human resources manager. *Id.* Following the opening of the Westerly store, Costello conducted a few additional interviews and recommended that two employees be transferred in to the store from different Home Depot stores. *Id.* Costello claims that he was not involved in the hiring process at the Waterford store. *Id.*

Costello taught forklift training classes and, when he had a department supervisor who was training to be an ASM, he would involve him or her in performance review meetings with sales associates to observe how the process worked. Def.'s 56(a)(1), Costello at ¶ 17; Costello 56(a)(2) at ¶ 17. The parties dispute whether Costello was responsible for ensuring that associates completed electronic training courses. *Id.* Costello recommended that associates receive certain types of training for their development. Def.'s 56(a)(1), Costello at ¶ 18; Costello 56(a)(2) at ¶ 18.

The MASM job description also states that the major tasks and responsibilities of

MASMs includes, "[s]cheduling Associates' work and training time." Def.'s 56(a)(1), Costello at ¶ 19; Costello 56(a)(2) at ¶ 19. As the stores where Costello worked, either the human resources manager or a store scheduler initially prepared the store schedule. Def.'s 56(a)(1), Costello at ¶ 20; Costello 56(a)(2) at ¶ 20. Costello then had the opportunity to review the schedules, but the parties dispute whether Costello reviewed the schedules to ensure that the departments were adequately staffed. *Id.* Costello would sometimes suggest changes to the store schedule when he determined there were not enough associates scheduled. *Id.*

When Costello received a call that an employee would not be at work, Costello would attempt to get coverage for those positions for the departments he was responsible for, and would notify the department supervisors for the other affected departments. Def.'s 56(a)(1), Costello at ¶ 21; Costello 56(a)(2) at ¶ 21. Costello did not need the store manager's approval to perform this task. *Id.* Costello could approve or disapprove employee requests for the scheduling of vacation time, and requests for vacation time were first approved by department supervisors. Def.'s 56(a)(1), Costello at ¶ 22; Costello 56(a)(2) at ¶ 22. Costello had the authority to sign off on edits to employee time records, but Costello asserts that this function was the principal responsibility of the operations manager. *Id.*

Costello held meetings with department supervisors to communicate action items and set a timeline as to when the actions would get done. Def.'s 56(a)(1), Costello at ¶ 23; Costello 56(a)(2) at ¶ 23. He also prepared task lists that needed to be done in a certain timeframe. *Id.* When his store manager suggested areas for improvement, Costello developed plans to implement any necessary changes, and followed up to ensure the tasks he had assigned had

been completed. *Id.* The parties dispute how much of Costello's time was taken up with these activities. *Id.*

The MASM job description also states that the major tasks and responsibilities of MASMs includes, "[c]oaching, training and developing Associates by providing both informal (e.g., on-floor coaching) and formal (e.g., written evaluation) job performance-based feedback." Def.'s 56(a)(1), Costello at ¶ 24; Costello 56(a)(2) at ¶ 24. Costello was responsible for preparing performance evaluations for the hourly associates every six months, one for purposes of determining annual raises, and one interim review to track performance issues. Def.'s 56(a)(1), Costello at ¶ 25; Costello 56(a)(2) at ¶ 25. Costello kept a file on each employee to track each employee's progress and updated these files on a monthly basis. *Id.* Costello personally prepared performance reviews for department supervisors, but the parties dispute whether Costello delegated responsibility for the review process for sales associates. *Id.* Costello met with department supervisors and sales associates to discuss the performance evaluations, and, at Waterford, the store managers would attend monetary reviews for department supervisors. *Id.*

In the performance evaluations Costello completed, Costello was involved with the recommendation of leadership and potential codes for sales associates, which could impact pay raises. Def.'s 56(a)(1), Costello at ¶ 25; Costello 56(a)(2) at ¶ 25. Costello estimates that his recommendations were accepted 90 percent of the time. *Id.* Costello participated in meetings regarding annual raises of both sales associates and department supervisors and, made recommendations about the raises his employees should receive. *Id.* Costello estimates those recommendations were followed 99 percent of the time. *Id.* In addition to the

semi-annual performance reviews, Costello could monitor and recognize associates' performance throughout the year. Def.'s 56(a)(1), Costello at ¶ 27; Costello 56(a)(2) at ¶ 27. Costello was able to give merit badges to employees, the accumulation of which could lead to a $100 reward. *Id.* Costello also recommended employees for various store awards. *Id.*

Costello mentored employees to help them advance professionally and would discuss efficiency and profitability improvements with department supervisors. Def.'s 56(a)(1), Costello at ¶ 28; Costello 56(a)(2) at ¶ 28. At the Westerly store, Costello would sometimes discuss with the store manager which associates were ready for a promotion; some of the individuals Costello identified were in fact promoted. Def.'s 56(a)(1), Costello at ¶ 29; Costello 56(a)(2) at ¶ 29. At least one employee so identified was offered promotion but declined the offer. Def.'s 56(a)(1), Costello at ¶ 30; Costello 56(a)(2) at ¶ 30.

The stores where Costello worked employed associates known as inventory management associates who put together initial merchandise orders and, in at least one performance evaluation, Costello was encouraged to have weekly meetings with those associates and department supervisors to ensure that departments were fully stocked. Def.'s 56(a)(1), Costello at ¶ 31; Costello 56(a)(2) at ¶ 31. The parties dispute whether Costello was responsible for reviewing the orders. *Id.* The parties dispute the degree to which Costello could determine what products to place along certain aisles and other parts of the store. Def.'s 56(a)(1), Costello at ¶ 32; Costello 56(a)(2) at ¶ 32.

The MASM job description also states that the major tasks and responsibilities of MASMs includes, "[m]aintaining department profitability through report analysis, identifying trends, defining problems and developing appropriate responses in three or more departments." Def.'s 56(a)(1), Costello at ¶ 33; Costello 56(a)(2) at ¶ 33. As part of his job as an MASM, Costello reviewed the Whole Store Report, which contained information related to profitability, "shrink," and labor hours, to see how his departments were doing. Def.'s 56(a)(1), Costello at ¶ 34; Costello 56(a)(2) at ¶ 34. At meetings, Costello mentioned various actions he was taking to try to increase sales, including recommending increasing staff in critical time periods like weekends and holidays. Def.'s 56(a)(1), Costello at ¶ 35; Costello 56(a)(2) at ¶ 35. Costello was responsible for ensuring the "shrink plan" was prepared and reviewing the shrink plan on a weekly basis. Def.'s 56(a)(1), Costello at ¶ 36; Costello 56(a)(2) at ¶ 36. When shrink audits revealed that his departments were not performing well, Costello met with the department head and/or store manager to take corrective action. *Id.*

Costello had the authority to discipline associates if he observed them acting contrary to Home Depot policies and procedures, including writing up the employee and determining corrective action. Def.'s 56(a)(1), Costello at ¶ 37; Costello 56(a)(2) at ¶ 37. Costello disputes that the disciplinary action entailed involved more than filling out a form. *Id.* Costello had the authority to send employees home if he determined they were behaving improperly, including if any employee disrespected a customer, was involved in a safety violation, brought weapons into the store, or was under the influence of alcohol or drugs. Def.'s 56(a)(1), Costello at ¶ 39; Costello 56(a)(2) at ¶ 39. Costello exercised this authority when one of his employees climbed into a dumpster shoot. *Id.* Costello stopped the employee, had him climb out of the shoot, punch out, and go home. *Id.* Costello reported the incident to his store manager, and the employ-

ee was terminated. *Id.* Costello attended the termination session. *Id.*

Costello was responsible for coaching employees and memorializing verbal conversations about performance ·issues. Def.'s 56(a)(1), Costello at ¶ 40; Costello 56(a)(2) at ¶ 40. Costello asserts this responsibility was shared by department supervisors. *Id.* Consultation with human resources or the store manager was only required if the problem involved a safety or hazardous waste issue. *Id.·*

The MASM job description also states that the major tasks and responsibilities of MASMs includes, "[e]nsuring Safety of Customers and Associates." Def.'s 56(a)(1), Costello at ¶ 42; Costello 56(a)(2) at ¶ 42. If there was a safety violation in the store when Costello was present, Costello was responsible for addressing it, and he would respond depending on the nature of the problem. Def.'s 56(a)(1), Costello at ¶ 43; Costello 56(a)(2) at ¶ 43. Costello asserts this responsibility was shared with department supervisors. *Id.* Costello walked his departments and inspected overhead material to make sure the items were properly situated, wrapped, and labeled. Def.'s 56(a)(1), Costello at ¶ 44; Costello 56(a)(2) at ¶ 44. If there was a problem with the overhead items, Costello would find associates to fix the issue. *Id.* Costello asserts that, if no associates were available, he was required by the store manager to fix the issue himself. Costello 56(a)(2) at ¶ 44.

When Costello opened the store, he was responsible for walking the entire store to ensure there were no safety hazards; if he observed any safety issues, he would address it with the assistant manager for that department and have it corrected before the store was opened to the public. Def.'s 56(a)(1), Costello at ¶ 45; Costello 56(a)(2) at ¶ 45. Costello ensured that anything outside the store was secured when he closed the store. Def.'s 56(a)(1),

Costello at ¶ 46; Costello 56(a)(2) at ¶ 46. The parties dispute whether Costello did this upon opening the store. *Id.* Costello had the code for the store's alarms and was frequently called into work when the alarm went off. *Id.* When called in to deal with the alarm, he had to shut off the alarm, deal with the police, walk the store, and reset the alarm. *Id.*

Costello was responsible for helping to ensure customers were satisfied. Def.'s 56(a)(1), Costello at ¶ 47; Costello 56(a)(2) at ¶ 47. Costello reviewed customer complaints, and had to devise a resolution within a day of receiving the complaint, which could include marking down the product, replacing the product, or calling the customer. *Id.* Costello also reviewed secret shopper reports once a month to monitor the job performance of the sales associates. *Id.* Costello addressed employee grievances, such as problems with other employees. *Id.* In such a situation, Costello could coordinate the transfer of the employee to another department. *Id.* Costello asserts such an action required approval of the store manager. *Id.*

In the Westerly store, Costello sometimes served as the Manager on Duty ("MOD") for three to four hours for shifts when he either opened or closed the store. Def.'s 56(a)(1), Costello at ¶ 49; Costello 56(a)(2) at ¶ 49. The parties dispute how often this occurred, and whether being MOD meant Costello was the only manager in the store at the time. *Id.* At the Waterford store, Costello was the MOD for at least three to four hours for shifts when he opened or closed the store. *Id.* The parties dispute how often this occurred and whether being MOD meant Costello was the only manager in the store at the time. *Id.* On at least some occasions, Costello was the only salaried manager in the store. Def.'s 56(a)(1), Costello at ¶ 50; Costello 56(a)(2) at ¶ 50. There

were also occasions when he and another assistant manager were responsible for the operation of the store and made sure the store was functioning, had money, and had customers. *Id.* Costello asserts that even at those times the store manager had ultimate responsibility for the store. *Id.* When Costello was the MOD at opening, he was responsible for making sure the store had cashiers, the vault was open, each department was staffed, and the daily reports were run. Def.'s 56(a)(1), Costello at ¶ 51; Costello 56(a)(2) at ¶ 51. Costello led an opening meeting with all of the associates in the store to tell them about new items to emphasize, make sure everyone's shrink plans and markdown sheets were completed, ensure cashiers had cash, and deal with other issues that arose. *Id.* Costello asserts these activities were the primary responsibility of the operations manager. *Id.*

When Costello was MOD when closing the store, he ensured that each department was cleaned and swept, all safety issues were addressed, all work lists from every department were being completed storewide, the vault was closed and counted, and the perimeter of the store was driven. Def.'s 56(a)(1), Costello at ¶ 52; Costello 56(a)(2) at ¶ 52. Costello asserts that he frequently did the cleaning and completion of work lists himself. *Id.* Costello led a closing meeting and addressed open issues. *Id.* When Costello closed the store on Saturdays or Sundays, he was also responsible for locking the doors and setting the alarms. *Id.*

Costello's starting salary as an MASM was $44,000 per year. Def.'s 56(a)(1), Costello at ¶ 53; Costello 56(a)(2) at ¶ 53. In April 2003, this amount was increased to $45,800 per year. *Id.* In April 2004, this amount was increased to $46,900 per year. In April 2005, this amount was increased to $50,000 per year. *Id.* Costello understood that his salary was to cover all hours

worked, and that he might have to work more than 55 hours per week. *Id.*

In addition to his base salary, Costello was eligible for a bonus of up to 25 percent of his annual salary based on store sales and stock options based on his performance and the store's performance. Def.'s 56(a)(1), Costello at ¶ 54; Costello 56(a)(2) at ¶ 54. Costello received a bonus for 2004 totaling $3,381.49. *Id.* He received more than 1,300 stock options between 2003 and 2005. *Id.* Hourly associates were not eligible to receive stock options or bonuses. *Id.* From 2004 to 2005, the midrange hourly rates for sales associates and department supervisors in the market where Costello worked were $12.64 and $16.97, respectively. Def.'s 56(a)(1), Costello at ¶ 55; Costello 56(a)(2) at ¶ 55. Costello asserts that this pay was supplemented by overtime pay, and that top pay for sales associates reached $17.57 per hour and for department supervisors reached $22.23 per hour. *Id.*

Costello was held accountable for the profitability of his departments and making his sales plans, and he was evaluated in part on department sales performance. Def.'s 56(a)(1), Costello at ¶ 56; Costello 56(a)(2) at ¶ 56. In his April 2004 performance evaluation, Costello was told to "focus on sales, safety, and shrink profitability" and "plan strategically to create growth, improve financial performance, and gain a competitive advantage." Def.'s 56(a)(1), Costello at ¶ 57; Costello 56(a)(2) at ¶ 57. Costello was also encouraged to "walk each department that you maintain in a deliberate manner to ensure than an accurate task list can be developed that will enhance your delegation [and] follow-up" so that he would hold his associates accountable. *Id.* Costello's April 2003 performance evaluation states that he needs to "increase sales in his departments." Def.'s 56(a)(1), Costello at ¶ 58; Costello

56(a)(2) at ¶ 58. This evaluation also instructs that he follow up on work lists given to department supervisors, execute shrink plans, think more about getting high margin products on "end caps," and challenge his associates to understand shrink and its impact on the profitability of the store. *Id.*

Costello spent up to three hours each week attending management meetings where he discussed sales plans, loss prevention, markdowns, new store programs, and shrink. Def.'s 56(a)(1), Costello at ¶ 59; Costello 56(a)(2) at ¶ 59. Costello asserts that department supervisors also attended those meetings. *Id.* Costello spent up to two hours each week walking the store by himself or with either his store manager or district manager. Def.'s 56(a)(1), Costello at ¶ 60; Costello 56(a)(2) at ¶ 60. Costello spent an hour each week reviewing reports. Def.'s 56(a)(1), Costello at ¶ 61; Costello 56(a)(2) at ¶ 61. Costello stated that keeping track of employees' performance issues was a "continuous operation." Def.'s 56(a)(1), Costello at ¶ 62; Costello 56(a)(2) at ¶ 62.

Costello asserts that he spent the majority of his time on, and the majority of his duties concerned, customer service and manual labor. Costello 56(a)(2) at ¶ 63, 64. Costello further asserts that stores were understaffed. *Id.* at ¶ 69. Costello also asserts that department supervisors were considered part of the management team and that they could serve as MOD. *Id.* at ¶ 75, 76. Costello asserts that department supervisors are directly responsible for supervising and counseling sales associates. *Id.* at ¶ 79, 80. Costello asserts that he did not make policy decisions for the stores in which he worked. *Id.* at ¶ 91.

### B. *Aron Moore*

Moore was hired by Home Depot in February 2003. Defendant's Local Rule 56(a)(1) Statement Regarding Aron Moore ("Def.'s 56(a)(1), Moore") (Doc. No. 99) at ¶ 6; Moore 56(a)(2) at ¶ 6. Moore was hired as an Assistant Store Manager in training. Def.'s 56(a)(1), Moore at ¶ 7; Moore 56(a)(2) at ¶ 7. Some of his training period consisted of classroom-based training, including courses on inventory management, safety, human resources policies, management by inclusion, and conflict management. *Id.* Around June 2003, Moore was promoted to Assistant Store Manager, and assigned to a store in New Hartford, Connecticut. Def.'s 56(a)(1), Moore at ¶ 8; Moore 56(a)(2) at ¶ 8. During his employment at the store, Moore was, in part, responsible for the Flooring, Kitchen, Millwork, and Décor departments. *Id.* In 2005, Moore transferred to a store in Derby, Connecticut as an ASM. Def.'s 56(a)(1), Moore at ¶ 9; Moore 56(a)(2) at ¶ 9. He was a Specialty Assistant Store Manager ("SASM") for a short period of time at that store. *Id.* He subsequently became a MASM and was responsible for the Garden, Lumber, and Building Materials departments until October 2006, and responsible for the Paint, Electrical, and Garden departments from October 2006 through March 2007. *Id.* Both the New Hartford store and the Derby store had annual sales of approximately $55 million per year and employed 150 to 200 employees. Def.'s 56(a)(1), Moore at ¶ 10; Moore 56(a)(2) at ¶ 10. Moore was terminated from Home Depot in March 2007 for what the company describes as unethical behavior. Def.'s 56(a)(1), Moore at ¶ 11; Moore 56(a)(2) at ¶ 11.

When he was first hired in 2003, Moore was paid a salary of $49,000 per year. Def.'s 56(a)(1), Moore at ¶ 13; Moore 56(a)(2) at ¶ 13. In September 2004, Moore was offered a job as a manager at another store and advised Home Depot that he may leave. Def.'s 56(a)(1), Moore at ¶ 14; Moore 56(a)(2) at ¶ 14. In order to keep Moore from leaving the company,

Home Depot increased his pay to $58,000 per year. *Id.* A district manager who advocated for this pay increase cited Moore's potential for growth with the company and his development of a tracking sheet used to drive sales to successful levels. Def.'s 56(a)(1), Moore at ¶ 15; Moore 56(a)(2) at ¶ 15. In 2006, Moore earned a salary of $60,000 per year and found it hard to find a job at another company that could match the pay rate. Def.'s 56(a)(1), Moore at ¶ 16; Moore 56(a)(2) at ¶ 16.

In 2004 and 2005, the median hourly rate in the market where Moore worked was $12.64 per hour for sales associates and $16.97 per hour for department supervisors. Def.'s 56(a)(1), Moore at ¶ 17; Moore 56(a)(2) at ¶ 17. Moore asserts that Home Depot also paid overtime pay for hours worked over 40 and that the company paid sales associates up to $17.57 per hour and department supervisors up to $22.23 per hour. Moore 56(a)(2) at ¶ 17. Moore received his salary on a biweekly basis. Def.'s 56(a)(1), Moore at ¶ 18; Moore 56(a)(2) at ¶ 18. Moore was paid the same amount regardless of the number of hours he worked and his salary was never reduced based on his hours. *Id.* In addition to his salary, Moore was eligible for annual bonuses of up to 25 percent of his salary. Def.'s 56(a)(1), Moore at ¶ 19; Moore 56(a)(2) at ¶ 19. These bonuses were based on store performance, including controlling payroll, profitability, and store safety. *Id.* As an ASM, Moore testified that he received one or two bonuses. Def.'s 56(a)(1), Moore at ¶ 20; Moore 56(a)(2) at ¶ 20. Hourly associates and department supervisors were not eligible for such bonuses. *Id.* Moore was eligible for stock options, which were awarded to MASMs annually based on performance evaluations. Def.'s 56(a)(1), Moore at ¶ 21; Moore 56(a)(2) at ¶ 21. As an MASM, Moore received stock options. Def.'s 56(a)(1), Moore at ¶ 22; Moore 56(a)(2) at ¶ 22. Hourly associates and department supervisors were not eligible for stock options. *Id.*

As an ASM at the Derby store, Moore conducted interviews with ten to fifteen applicants for hire per year. Def.'s 56(a)(1), Moore at ¶ 24; Moore 56(a)(2) at ¶ 24. Following each interview, Moore would evaluate the candidate. *Id.* The Human Resources Manager asked Moore about the interviewee, and Moore would give an opinion. *Id.* Moore testified that there "might have been one or two department heads that I hired." Def.'s 56(a)(1), Moore at ¶ 25; Moore 56(a)(2) at ¶ 25. Moore disputes that he meant he hired them himself. Moore 56(a)(2) at ¶ 25. One or two of the people he rated favorably were hired. Def.'s 56(a)(1), Moore at ¶ 26; Moore 56(a)(2) at ¶ 26.

Moore testified that it was his responsibility as an ASM to teach his department supervisors. Def.'s 56(a)(1), Moore at ¶ 27; Moore 56(a)(2) at ¶ 27. Moore testified that he trained and developed his associates. Def.'s 56(a)(1), Moore at ¶ 28; Moore 56(a)(2) at ¶ 28. Moore, on at least one occasion, delegated certain training and identified areas in which he wanted his department supervisors to train his associates. Def.'s 56(a)(1), Moore at ¶ 29; Moore 56(a)(2) at ¶ 29.

As an ASM, Moore could recommend changes to the store schedule. Def.'s 56(a)(1), Moore at ¶ 30; Moore 56(a)(2) at ¶ 30. Moore could approve associate shift swaps. *Id.* If an employee called out sick, Moore had the authority to call another associate to replace him or reassign an associate from another department to cover for the sick associate. Def.'s 56(a)(1), Moore at ¶ 31; Moore 56(a)(2) at ¶ 31. As an ASM, Moore provided leadership to associates. Def.'s 56(a)(1), Moore at ¶ 32; Moore 56(a)(2) at ¶ 32. Moore was responsible for supervising the associates in his department. Def.'s 56(a)(1), Moore at

¶ 33; Moore 56(a)(2) at ¶ 33. Moore asserts that department supervisors were also responsible for supervising associates. Moore 56(a)(2) at ¶ 33. On at least one occasion, Moore asked the store manager who was supervising associates who had to deal with a shipment of Christmas trees and was told he was supervising them and that he needed to fix the attendant safety issues. Def.'s 56(a)(1), Moore at ¶ 33; Moore 56(a)(2) at ¶ 33.

Moore sometimes directed associates to perform certain tasks, such as stocking merchandise. Def.'s 56(a)(1), Moore at ¶ 34; Moore 56(a)(2) at ¶ 34. He had the authority to either assign tasks to associates in the departments he managed or get an associate from another department to perform the tasks. *Id.* Associates assigned tasks would report to Moore that they had completed the task and Moore would check in on their progress. Def.'s 56(a)(1), Moore at ¶ 35; Moore 56(a)(2) at ¶ 35. At least for the departments he was assigned to, Moore had the authority to prioritize associates' tasks. Def.'s 56(a)(1), Moore at ¶ 36; Moore 56(a)(2) at ¶ 36. On at least one occasion, Moore requested that a department supervisor walk with him daily to discuss department standards, weekly goals, and the completion of work lists. Def.'s 56(a)(1), Moore at ¶ 37; Moore 56(a)(2) at ¶ 37. At least when Moore was assigned to specialty departments, he held biweekly department meetings with the associates to inform them of their sales performance, give them advice on sales techniques, and address customer issues. Def.'s 56(a)(1), Moore at ¶ 38; Moore 56(a)(2) at ¶ 38. Moore would perform tasks such as stocking shelves in part to ensure customer safety. Def.'s 56(a)(1), Moore at ¶ 39; Moore 56(a)(2) at ¶ 39. Moore had a choice of whether to perform or delegate such tasks, and would often perform the tasks himself because he worried that an associate may not perform the task correctly. *Id.* When Moore was working on the floor, he could concurrently coach and develop his team, although Moore asserts this happened rarely. Def.'s 56(a)(1), Moore at ¶ 40; Moore 56(a)(2) at ¶ 40.

As an ASM, Moore was responsible for preparing the performance evaluations of the department supervisors in his departments. Def.'s 56(a)(1), Moore at ¶ 42; Moore 56(a)(2) at ¶ 42. Moore would identify strengths and weaknesses and also develop plans for improvement. *Id.* Moore discussed his ratings recommendations on the performance evaluations with other salaried managers at roundtable meetings. Def.'s 56(a)(1), Moore at ¶ 43; Moore 56(a)(2) at ¶ 43. Moore based his recommendations on the employee's willingness to learn, work ethic, overall behavior, and ability to drive sales. *Id.* Moore asserts that department supervisors also carried out these tasks. *Id.* Sometimes people Moore recommended got the rating he proposed for them. Def.'s 56(a)(1), Moore at ¶ 44; Moore 56(a)(2) at ¶ 44. Moore checked performance evaluations for consistency and provided input into the rating. Def.'s 56(a)(1), Moore at ¶ 45; Moore 56(a)(2) at ¶ 45.

Associates and department supervisors received two evaluations per year: an annual monetary review and a mid-year, nonmonetary review. Def.'s 56(a)(1), Moore at ¶ 46; Moore 56(a)(2) at ¶ 46. The parties dispute whether the performance ratings given in the performance evaluations were tied to salary increases that an associate or department supervisor was eligible for. Def.'s 56(a)(1), Moore at ¶ 47; Moore 56(a)(2) at ¶ 47. Following the associates' and department supervisors' annual reviews, Moore would meet with them to inform them of their pay increase and discuss their evaluation. Def.'s 56(a)(1), Moore at ¶ 48; Moore 56(a)(2) at ¶ 48. Moore or his department supervisor would

deliver the non-monetary evaluation to his associates. Def.'s 56(a)(1), Moore at ¶ 49; Moore 56(a)(2) at ¶ 49. Moore could also give "merit badges" to associates to reward them for good behavior. Def.'s 56(a)(1), Moore at ¶ 50; Moore 56(a)(2) at ¶ 50. He was given several each month to award to associates. *Id.* He awarded merit badges based on his discretion if he saw an associate provide good customer service. *Id.* Associates received a bonus for every five merit badges that they received. *Id.*

Moore was responsible for ensuring that his departments were properly stocked. Def.'s 56(a)(1), Moore at ¶ 51; Moore 56(a)(2) at ¶ 51. Inventory Management Associates ("IMAs") order products for Home Depot stores and, before IMSs can place an order, an ASM or the store manager must approve of the order. Def.'s 56(a)(1), Moore at ¶ 52; Moore 56(a)(2) at ¶ 52. Moore reviewed orders placed by IMAs and would at times disagree with the proposed order and make changes. Def.'s 56(a)(1), Moore at ¶ 53; Moore 56(a)(2) at ¶ 53.

Moore was responsible for meeting departmental sales goals and he worked to achieve these goals by monitoring specialty sales and ensuring that his departments were well stocked. Def.'s 56(a)(1), Moore at ¶ 55; Moore 56(a)(2) at ¶ 55. Moore created a spreadsheet that would track associates' sales numbers, and this was used to monitor whether the associate was meeting his or her sales plan. Def.'s 56(a)(1), Moore at ¶ 56; Moore 56(a)(2) at ¶ 56. He delegated the task of updating the spreadsheet on a weekly basis to one of his department supervisors. Def.'s 56(a)(1), Moore at ¶ 57; Moore 56(a)(2) at ¶ 57. When an associate was not on track to meet a sales plan, Moore would meet with that associate and coach them, and he also encouraged a department supervisor to do the same. Def.'s 56(a)(1), Moore at ¶ 58; Moore 56(a)(2) at ¶ 58. Moore would role play with his associates to allow them to practice their selling techniques. *Id.* Moore's store had the highest installed product sales in the district, a result Moore attributes to holding his associates accountable for their performance and his "management." Def.'s 56(a)(1), Moore at ¶ 59; Moore 56(a)(2) at ¶ 59.

Moore had the authority to discipline associates, conditioned on approval from the Human Resources Manager. Def.'s 56(a)(1), Moore at ¶ 60; Moore 56(a)(2) at ¶ 60. There were three levels of discipline at Home Depot: counseling, formal counseling, and termination. Def.'s 56(a)(1), Moore at ¶ 61; Moore 56(a)(2) at ¶ 61. Moore delivered discipline notices to the associates, but the parties dispute whether Moore could issue notices and the degree to which Moore was active in terminating employees. *Id.* Moore could fill out a Performance Discussion Tracking Form to record his conversation with associates about their performance. Def.'s 56(a)(1), Moore at ¶ 62; Moore 56(a)(2) at ¶ 62. Moore decided when to complete the form. *Id.* The parties dispute the extent to which, and the circumstances under which, Moore had the ability to suspend employees. Def.'s 56(a)(1), Moore at ¶ 63; Moore 56(a)(2) at ¶ 63. Moore recalled that two or three occasions in which he either suspended an employee or sent them home early. *Id.* Moore could recommend that associates be terminated and his recommendations could have been followed. Def.'s 56(a)(1), Moore at ¶ 64; Moore 56(a)(2) at ¶ 64.

Moore was at least one of the people responsible for store safety and for ensuring that merchandise was secured at night. Def.'s 56(a)(1), Moore at ¶ 66; Moore 56(a)(2) at ¶ 66. Moore was at least one of the people responsible for ensuring that the store was safe for both employees and

customers to enter. Def.'s 56(a)(1), Moore at ¶ 67; Moore 56(a)(2) at ¶ 67. Moore had the keys to the store, the store alarm codes, and the vault code. Def.'s 56(a)(1), Moore at ¶ 68; Moore 56(a)(2) at ¶ 68.

Moore served as MOD in both of the stores he worked at. Def.'s 56(a)(1), Moore at ¶ 70; Moore 56(a)(2) at ¶ 70. When Moore was the only manager at the store, he was in charge of the entire store. *Id.* When Moore was MOD, he would walk the store for the length of time he was MOD. *Id.* Moore was the only manager in the store approximately ten to twelve hours per week. Def.'s 56(a)(1), Moore at ¶ 71; Moore 56(a)(2) at ¶ 71. Moore opened or closed the store, depending on his assigned shift. Def.'s 56(a)(1), Moore at ¶ 72; Moore 56(a)(2) at ¶ 72. When opening or closing the store, he would walk the store to ensure that there were no safety issues or unauthorized personnel. *Id.* The parties dispute whether Moore would prepare work lists based on these logs. *Id.* Moore would sometimes fill out a safety log. *Id.*

Moore was at least one of the people who handled customer complaints. Def.'s 56(a)(1), Moore at ¶ 73; Moore 56(a)(2) at ¶ 73. Moore might resolve customer complaint issues himself, escalate the issue, or delegate it to an associate or department supervisor to handle, although Moore asserts that department supervisors could handle complaints on their own. *Id.* Moore could determine whether to mark down merchandise for customers. *Id.* The parties dispute the extent to which Moore handled associate grievances, and whether he handled them on his own, or first brought the grievance to the attention of the Human Resource Manager. Def.'s 56(a)(1), Moore at ¶ 74; Moore 56(a)(2) at ¶ 74.

If an employee missed his or her time punch, Moore had the authority to approve of his or her Time and Attendance change forms. Def.'s 56(a)(1), Moore at ¶ 75; Moore 56(a)(2) at ¶ 75. Moore participated in a weekly specialty conference call with other specialty managers in the district when he was a specialty manager. Def.'s 56(a)(1), Moore at ¶ 76; Moore 56(a)(2) at ¶ 76.

Moore was evaluated, in part, on his ability to meet department sales and shrink goals, profit and loss of his departments, and the gross margin of the store. Def.'s 56(a)(1), Moore at ¶ 77; Moore 56(a)(2) at ¶ 77. Moore was also evaluated on his ability to teach department supervisors. Def.'s 56(a)(1), Moore at ¶ 78; Moore 56(a)(2) at ¶ 78.

At least when Moore was assigned only to merchandising departments and designated a MASM, he worked between 60 and 65 hours per week. Def.'s 56(a)(1), Moore at ¶ 81; Moore 56(a)(2) at ¶ 81. At least when Moore was assigned to the specialty departments, he spent two hours per day reviewing and running the specialty reports and numbers. Def.'s 56(a)(1), Moore at ¶ 82; Moore 56(a)(2) at ¶ 82.

Moore spent approximately two hours per week performing store or department walks. Def.'s 56(a)(1), Moore at ¶ 83; Moore 56(a)(2) at ¶ 83. Moore spent 45 minutes per week drafting task lists. Def.'s 56(a)(1), Moore at ¶ 84; Moore 56(a)(2) at ¶ 84. Moore spent 35 minutes per week assigning work to associates. Def.'s 56(a)(1), Moore at ¶ 85; Moore 56(a)(2) at ¶ 85. Moore spent one hour per week in staff meetings. Def.'s 56(a)(1), Moore at ¶ 86; Moore 56(a)(2) at ¶ 86. Moore spent 50 minutes per week training and developing his staff. Def.'s 56(a)(1), Moore at ¶ 87; Moore 56(a)(2) at ¶ 87. Moore spent 10 to 15 minutes per week talking to his department supervisors about the operation of their departments, and that he could talk and work at the

same time. Def.'s 56(a)(1), Moore at ¶ 88; Moore 56(a)(2) at ¶ 88.

Moore asserts that he spent the majority of his time as an employee on customer service and manual labor or other non-managerial tasks. Moore 56(a)(2) at ¶ 90, 91. Moore asserts that on a weekly basis he spent less than six hours on managerial tasks when he was a MASM and 16 hours on such tasks when he was an SASM. *Id.* at ¶ 94. Moore asserts that Home Depot's stores were consistently understaffed. *Id.* at ¶ 96. Moore asserts that he had as an MASM essentially the same duties and responsibilities as department supervisors, except that he had to work more hours than they did. *Id.* at ¶ 101. Moore asserts that department supervisors were part of the management team and could serve as MOD. *Id.* at ¶ 102, 103. Moore asserts that Store Managers were responsible for the stores. *Id.* at ¶ 105. Moore asserts that department supervisors were directly responsible for supervising sales associates and for counseling and coaching sales associates, and participated in weekly manager meetings. *Id.* at ¶ 106–08. Moore asserts that the store manager made the ultimate determination regarding increases in pay for associates and department supervisors. *Id.* at ¶ 109. Moore asserts that he did not have the authority to hire or fire employees. *Id.* at ¶ 113, 114. Moore asserts that he did not make policy decisions for the store. *Id.* at ¶ 118.

Moore asserts that he reported directly to his store manager and routinely received assignments from that person. *Id.* at ¶ 121–22. Moore asserts that he was required to work a minimum of 55 hours a week but frequently worked 60 to 65 hours per week when he was an MASM and 60 to 70 hours per week when he was an SASM. *Id.* at ¶ 123.

## IV. DISCUSSION

The sole issue before the court is whether summary judgment is appropriate as to whether Costello and Moore were misclassified as exempt from the overtime requirements of the FLSA. Home Depot argues no issue of material fact exists as to this point and that both employees were properly classified as exempt under the "executive employee" provision of the FLSA. *See* Defendant's Memorandum of Law in Support of Motion for Summary Judgment as to James Costello ("Def.'s Memo. Supp. Mot. Summ. J., Costello") (Doc. No. 94) at 1; Defendant's Memorandum of Law in Support of Motion for Summary Judgment as to Aron Moore ("Def.'s Memo. Supp. Mot. Summ. J., Moore") (Doc. No. 100) at 1.

The FLSA states that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). This overtime pay requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Though not specifically addressed in the Rule 56(a) statements, there is no dispute that Costello and Moore, in their capacities as MASMs, ASMs, and SASMs, are currently classified by Home Depot as exempt from the FLSA's overtime pay requirements or that Home Depot is an employer to which the FLSA applies.

"Since this exemption provides an affirmative defense to overtime claims, the employer has the burden of proving that a plaintiff is an exempt 'bona fide executive' by a preponderance of the evidence." *Scott v. SSP America, Inc.,* No.

09–CV–4399 (RRM)(VVP), 2011 WL 1204406, *6 (E.D.N.Y. Mar. 29, 2011) (citing *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir.2002)). "Exemptions to the FLSA are 'narrowly construed against the employers seeking to assert them.'" *Bilyou*, 300 F.3d at 222 (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)). "The determination of whether an employee is exempt from the overtime requirements of the FLSA is a 'highly fact intensive inquiry that must be made on a case-by-case basis in light of the totality of the circumstances.'" *Scott*, 2011 WL 1204406 at *6 (quoting *Johnson v. Big Lots Stores, Inc.*, 604 F.Supp.2d 903, 908 (E.D.La.2009)). *See also Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361, 2010 WL 1327242, at *6 (S.D.N.Y. Mar. 31, 2010) ("Many courts have held that resolving this difficult and intensive factual inquiry is inappropriate at summary judgment."). The scope of the employee's duties is a question of fact, but "the question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986).

Under the "bona fide executive" exemption, as of 2004, federal regulations exempt an employee:

(1) Compensated on a salary basis at a rate of not less than $455 per week …;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

## A. Costello

The court first turns to Costello. The court will consider the four factors governing application of the executive exemption.

### 1. First Factor

As to the first factor, concerning the rate of compensation, Costello does not dispute that this factor is satisfied as to him. *See* Costello's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Costello Memo Opp. Mot. Summ. J.") (Doc. No. 111) at 8 n. 7 ("Plaintiff does not contest that his salary satisfied this requirement.").

### 2. Third Factor

As to the third factor, concerning whether Costello customarily and regularly directed the work of two or more other employees, Costello does not appear to contest this fact. Costello's opposition memorandum contains a footnote ostensibly related to this factor, but the substance of that footnote addresses another factor entirely. *See* Costello Memo Opp. Mot. Summ. J. at 8 n. 7. Accordingly, the court deems this third factor satisfied for the purposes of this Motion for Summary Judgment.

### 3. Fourth Factor

The fourth factor concerns whether Costello had the authority to hire or fire other employees or whether his suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees were given particular weight. The regulations state:

To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited

to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105. Home Depot argues that the frequency of Costello's input into the interviewing process (over 200 interviews at the Westerly store), his input into the promotion and salary raise process for subordinates, and the relatively high frequency with which his suggestions were followed suggest that this factor is satisfied. Costello contends (briefly, and in a footnote) that because he did not have the ultimate authority to make these decisions (something Home Depot does not dispute), a material issue of fact remains as to whether his recommendations were given particular weight. The court notes that the regulations state that the frequency with which an employee's suggestions and recommendations are sought and relied upon are among the factors courts should consider when evaluating this factor. Here, Costello testified that 90 percent of his recommendations, which were relatively large in number, were ultimately agreed with. The court, however, notes the absence of affidavit testimony demonstrating that these recommendations actually had an impact on those receiving them. While such evidence is not absolutely necessary in order to grant a summary judgment motion, its absence fails to resolve the issue of material fact raised by Costello's testimony that his opinions were not accorded particular weight by his supervisors. Drawing all inferences in favor of Costello, as the court must on Home Depot's Motion for Summary Judgment, Home Depot has not established an absence of a material issue of fact as to this factor.

### 4. Second Factor

The court now turns to the second factor, concerning whether Costello's primary duty was management of the enterprise. As with the bulk of cases involving the executive exemption, it is this factor that is most hotly contested between the parties.

Federal regulations provide further instructions with respect to the definitions of both "management" and "primary duty." Before 2004, the regulations provided a list of duties that were generally understood to be managerial, including:

Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102(b) (2003). The 2004 regulations added three additional duties to this list, including "providing for the . . . security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102.

" 'Primary duty' is defined by the regulations as 'the principal, main, major or most important duty that the employee performs.' To determine whether plaintiffs' performance of these exempt activities constitutes their 'primary duty,' a court must consider 'the character of an employee's job as a whole.' " *Mullins v. New York*, 653 F.3d 104, 106 (2d Cir.2011) (quoting 29 C.F.R. § 541.700(a)). The pre–2004 explanation of primary duty included four factors a court should consider, in addition to "[t]he amount of time spent in the performance of the managerial duties," including:

> the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

29 C.F.R. § 541.103 (2003). The current statutes no longer mention "the frequency with which the employee exercises discretionary powers." *See* 29 C.F.R. § 541.700. However, courts understand this factor to be incorporated into an analysis of an employee's "relative freedom from supervision." *See, e.g., Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1270 n. 57 (11th Cir.2008) ("Having discretionary power is one aspect of freedom from supervision."). Additionally, the regulations outlining the meaning of "primary duty" explain:

> Assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

### a. Relative Importance of Exempt Duties

The court turns first to the question of the relative importance of the managerial duties that Costello undertook.

Home Depot argues that Costello frequently performed managerial tasks as set out in 29 C.F.R. § 541.102, and that those tasks were Costello's principal value to the company. Home Depot argues:

> [Costello] (1) interviewed between 200 and 300 candidates and helped select candidates for hire; (2) trained employees; (3) adjusted employee schedules; (4) provided input concerning employees' rate of pay; (5) reviewed and analyzed various reports relevant to the management of his departments; (6) appraised productivity and efficiency and recommended several individuals for promotion; (7) handled both employee and customer complaints; (8) disciplined employees; (9) planned, assigned, and monitored work; (10) reviewed and approved product orders; (11) ensured the safety of the store; and (12) enforced Home Depot policy.

Def.'s Memo. Supp. Mot. Summ. J., Costello at 16. Home Depot further contends that these duties constituted Costello's principal value to Home Depot, which it

claims is evident from the inherent import of the tasks performed (such as the periods during which Costello served as Manager on Duty), the rigor of the process of promotion and training that prepared Costello for his MASM duties, company performance evaluations that concentrated criticism on Costello's more managerial duties, and Costello's compensation arrangement, which involved the receipt of bonuses and stock options that were based on store sales. *Id.* at 22–25. Costello disputes this characterization, and argues:

> [T]he ultimate success or failure of the store did not hinge on Plaintiff performing his management duties, but the store would have failed if Plaintiff did not complete his non-managerial work. Indeed, it is clear from the testimony and other evidence on record that Plaintiff and other MASMs were expected to ... make sure the store was clean, that it was in stock and customers were served no matter how many hours it took them to accomplish all of those tasks.

Costello Memo Opp. Mot. Summ. J. at 20.

Unlike some of the other cases to consider the relative importance of an employee's more managerial duties, here the court does not have any direct testimony from Home Depot officials as to how the company viewed the importance of the various tasks assigned to and carried out by Costello. Instead, the court is left to attempt to divine such conclusions, in part, from what can only be described as a somewhat intuitive assessment of what duties are critical to a large-scale retail operation. The Second Circuit, however, clearly contemplates courts making such assessments. In *Donovan v. Burger King Corp.*, the court observed:

> [T]he record fully supports Judge Sifton's finding that the principal responsibilities of Assistant Managers, in the sense of being most important or critical

to the success of the restaurant, are managerial. Many of the employees themselves so testified and it is clear that the restaurants could not operate successfully unless the managerial functions of Assistant Managers, such as determining amounts of food to be prepared, running cash checks, scheduling employees, keeping track of inventory, and assigning employees to particular jobs, were performed. For that reason, as well as the fact that much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of these employees is managerial.

*Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir.1982). It is undisputed that Costello performed at least some of the tasks that track those outlined in *Donovan*, although the frequency with which Costello performed those tasks, and whether he was the only person performing them, is a matter of contention. Also unclear is how other employees regarded the importance of what Costello was doing. As stated above, unlike in *Donovan*, the defendants here provide no corroborating testimony or evidence as to whether Costello's ostensibly managerial tasks were "critical to the success" of the store. In *Clougher v. Home Depot*, the court considered a similar claim by an MASM in a Home Depot store. In that case, the employee conceded to performing some managerial tasks, but claimed, similarly to Costello, to performing those tasks infrequently, and only in a supporting role to his other, more important non-exempt work. The court found this dispute sufficient to preclude summary judgment because of outstanding factual issues. *See Clougher v. Home Depot*, 696 F.Supp.2d 285, 291–92 (E.D.N.Y.2010). *Clougher* relied heavily for this conclusion on *Johnson v. Big Lots Stores, Inc.*, 604 F.Supp.2d

903, 915–17 (E.D.La.2009), which concluded, following a bench trial, that a former manager's primary value to a retail store was non-managerial. The court based this assessment on a fuller record than that presented here, and included observations that the importance of the employee's non-exempt tasks was impressed on him during his job interview, the retail store had a corporate policy to delegate non-exempt tasks to salaried employees to save on overtime costs, many of the managerial-type tasks were also performed by other, non-salaried employees, and other such tasks were constrained by corporate policies and checklists that limited discretion.

Other courts have not found similar ambiguities sufficient to demonstrate a material issue of fact. In *Guinup v. Petr–All Petroleum Corp.*, the court concluded:

> [W]hile Plaintiff also performed a number of non-managerial tasks (including ringing register, stocking shelves, counting cigarettes, printing sales reports, counting products, checking in vendors, and servicing customer needs), and may not have been the only employee at Store 360 who trained new employees and corrected employee performance problems, the undisputed facts in the record demonstrate that Plaintiff's managerial functions were more important to the success of Store 360 than her non-managerial functions. In other words, while Store 360 could have operated—albeit poorly—if Plaintiff did not perform her non-managerial duties, Store 360 could not have operated successfully unless Plaintiff performed her managerial functions, such as hiring, training, and scheduling employees, completing the daily paper-work, and regularly reporting various day-to-day issues to corporate.

*Guinup v. Petr–All Petroleum Corp.*, No. 5:07–CV–1120 (GTS/ATB), 2010 WL 3338800, *8 (N.D.N.Y. Aug. 23, 2010); *see also Thomas v. Speedway SuperAmerica,*

*LLC,* 506 F.3d 496, 505 (6th Cir.2007) ("If Thomas failed to perform her nonmanagerial duties, her Speedway station would still function, albeit much less effectively. After all, most of us—even if unwillingly—have visited and spent our money at filthy gas stations with sparsely stocked shelves. If, however, Thomas failed to perform her managerial duties, her Speedway station would not function at all because no one else would perform these essential tasks. Surely, a gas station cannot operated if it has not hired any employees, has not scheduled any employees to work, or has not trained its employees on rudimentary procedures such as operating the register.").

Here, Costello certainly conducted a large number of interviews with potential hires over the course of his employment and had at least some input into the hiring process (although he did not make the ultimate determinations), participated in some training of lower-level employees, reviewed staffing schedules initially complied by other employees (although Costello insists, and his deposition testimony seems to confirm, that Costello did not review those schedules for the purposes of ensuring adequate staffing), participated in worker performance evaluation, dealt with safety issues, and dealt with customer complaints. However, it also appears that many of these duties were sometimes shared by other employees, or, in the case of inventory orders, were sometimes carried out without any managerial supervision at all. The evidence in the record does not definitely answer these questions.

Perhaps the most potentially critical job function Costello performed related to his occasional duties as MOD, in which he would open or close the store, and was sometimes the only salaried manager in the store. Although sometimes accompanied by other managers, Costello would,

during at least some of those periods, make sure the store had cashiers, open the vault, ensure department staffing, and run daily reports. Although a store manager held ultimate responsibility, Home Depot's argument that Costello's functions as MOD were indeed critical for store success are significantly more persuasive than its contentions regarding his other responsibilities. However, the amount of time actually spent on this activity is hotly disputed. In *Big Lots*, the court considered a scenario in which the employee was "manager in charge" for some, but not a majority of, the work week. The court found that temporary elevation of responsibilities insufficient to conclude that the employee's primary duty was managerial, even if during those periods store success was more deeply implicated by the employee's managerial actions. *Big Lots*, 604 F.Supp.2d at 915.

Here, given the absence of corroborating testimony from Home Depot officials or other employees regarding the importance of Costello's various tasks, divergent accounts of the amount of time actually spent on managerial tasks (including performance of MOD functions), the degree to which those functions were replicated by lower-level employees, Costello's testimony that he was informed by supervisors that customer service was his primary job function, and his somewhat uncertain degree of influence in hiring decisions, a material issue of fact remains as to the relative importance of Costello's managerial functions.

### b. Time Spent Performing Non–Exempt Work

The court will also consider the amount of time Costello spent performing nonexempt work as part of its inquiry into whether managerial tasks constituted Costello's primary duty. The federal regulations state:

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. This, employees who spend more than 50 percent of their time performing exempt wok will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700(b). Analysis of this section here is not particularly illuminating as Home Depot does not appear to argue that Costello crossed the 50 percent threshold in the performance of exempt managerial work. As is obvious from the regulation however, this fact is not dispositive one way or the other, as "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if other factors support such a conclusion." Costello maintains that of a workweek that varied between 60 and 80 hours, around ten hours could be spent doing traditionally managerial tasks. Additionally (or possibly overlappingly), Costello engaged in MOD-related activities (either alone or with other managers) between nine and 40 hours per week.

In short, it is unclear which way this evidence cuts, or what the actual scope of Costello's duties, in terms of time spent, was. A variation between less than ten percent to nearly 50 percent of time spent, at least partially, doing managerial tasks is indeed a significant one for the purposes of this analysis. While perhaps less favorable to Costello's position than the issue of relative importance, the factual disputes

here still create a material issue of fact as to Costello's primary duty that precludes determination as a matter of law. The court further notes that neither side has introduced evidence as to whether Costello was capable, given the tasks at hand, of simultaneously performing managerial and non-managerial tasks, something that courts which have found that employees were properly exempt have relied on when considering a situation in which the majority of an employee's time is spent on non-exempt tasks. *See e.g., Donovan,* 675 F.2d at 521 ("For that reason, as well as the fact that much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of these employees is managerial."). Given the fact-intensive nature of this inquiry, the court refrains from assuming the ease of such multitasking in the specific context of the Home Depot stores in which Costello worked. As such, a material issue of fact remains as to this factor which precludes determination as a matter of law.

c.   Freedom from Direct Supervision

The court notes, as a preliminary matter, that Costello's employment included periods both before and after the Primary Duty regulations' 2004 revision. Prior to 2004, courts considered, as a separate factor, the frequency with which an employee exercised discretionary powers. As the evidence presented in this case is not so neatly compartmentalized into pre- and post–2004 activities, the court will analyze both together and attempt to explain any potential differences to its analysis, should the exercise of discretion be considered a separate factor.

Home Depot argues that Costello frequently exercised discretion, with a minimum of oversight, as a MASM. This discretion was primarily demonstrated through Costello's role in preparing per-formance reviews (a task Costello claims was often delegated to non-salaried employees), recommending annual raises and additional training, decisions related to dealing with employees who called out of work, dealing with customer complaints, and other such activities. Def.'s Memo. Supp. Mot. Summ. J., Costello at 25–26.

Further, Home Depot argues that, not only was Costello, when he was MOD, sometimes the only salaried manager in the store, even when the store manager was present Costello engaged in a great deal of discretionary activity as MASM as to the departments he was assigned to:

[It] was Costello who: (1) ensured his departments were properly staffed; (2) planned the work to be done in each department; (3) delegated work to his subordinates and followed up to make sure it was done in a timely and correct manner; (4) ensured his subordinates were trained, both for their current position and so they would be ready to advance to the next level; (5) ensured proper merchandise was ordered; (6) inspected his departments for safety violations; (7) resolved employee and customer complaints; (8) made recommendations regarding annual raises for his employees; (9) counseled associates on disciplinary issues; (10) recognized his subordinates for exceptional performance; and (11) devised strategies to improved department sales.

*Id.* at 27–28. Costello asserts that, while he performed many of these tasks, in many instances—particularly related to hiring, firing, and scheduling decisions—ultimate decision-making power and discretion lay elsewhere. Further he contends that he did so infrequently, and that when he did, he was in large part constrained by corporate policies.

The existence of corporate policies does not, categorically, limit such discretion.

*See Donovan,* 675 F.2d at 521–22. Further, Costello does not actually explain how, and in what sense, his discretionary powers were limited by specific corporate policies. More substantively, while Costello was always subject in the corporate chain of command to the store manager, he was also often accompanied by other managers while MOD, and while some tasks, such as ordering supplies and scheduling, were carried out in large part by others, it seems clear that Costello had a relatively free hand within his areas of influence. Taken together, these facts lay out a scope of activity that lends itself to a conclusion that Costello was relatively free from direct supervision. While this is not dispositive of the Motion for Summary Judgment, this factor appears to weigh in favor of Home Depot.

### d. Salary

The court next considers how Costello's salary compares to wages paid nonexempt workers for performing similar tasks. Costello earned between $44,000 and $50,000 during the course of his employment, during which he was expected to work at least 55 hours per week, and sometimes worked between 60 and 80 hours per week. Additionally, Costello could receive performance bonuses and stock options, and received a bonus in 2004 for $3,381.49 and 1,300 stock options between 2003 and 2005. It is unclear what the total value of those stock options are, or when Costello received them.

The parties do not provide a breakdown of how many weeks per year Costello was expected to work. Assuming a 55 hour work week and a 52 week per year work schedule, Costello earned between $15.38 per hour ($846.15 per week) and $17.42 per hour ($961.54 per week). From 2004 to 2005, the mid-range hourly rate for sales associates was $12.64 per hour and for department supervisors was $16.97. Home Depot, would, perhaps, contend that salaries should be compared on a weekly, as opposed to hourly basis, ostensibly under the assumption that most non-salaried employees work only 40 hours per week. As the court in *Clougher* observed, however:

[T]here is nothing in the record to render Clougher's counter-argument implausible; namely, that his hourly pay rate, where properly calculated, is substantially less than comparable hourly-wage supervisors—at least when accounting for: (a) Home Depot's mandatory 55–hour MASMs workweeks, and (b) Clougher's allegation that his typical workweeks greatly exceeded that requirement. If true, Clougher inches closer to demonstrating a calculated economic decision to misuse MASMs. Given the potential import of an hourly-wage analysis, this Court is compelled to reject Home Depot's all too pat concern for the burdens of engaging in such "mathematical gymnastics."

*Clougher,* 696 F.Supp.2d at 293. The court does recognize that bonuses and stock options were unavailable to lower-level employees, something that suggests greater importance and a more central role for Costello. However, the dollar amounts in question, particularly when factoring in unresolved factual questions of which hourly rates it should compare and the availability of overtime for lower-level employees, do not appear to yield a significant disparity in compensation that suggest as a matter of law that Costello's primary duty was management. As such, it is not clear in which party's favor this factor weighs.

Taking all these factors together, it is clear that material issues of fact exist as to Costello's primary duty at Home Depot, precluding summary judgment. Accordingly, Home Depot's Motion for Summary Judgment as to Costello is denied.

### B. *Moore*

The court next turns to Aron Moore. More's claims are substantially similar to those of Costello, and the underlying law and applicable regulations are the same. Accordingly the court will rely on the legal background stated in the sections above.

#### 1. First Factor

As to the first factor, concerning the rate of compensation, Moore does not dispute that this factor is satisfied as to him. *See* Moore's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Moore Memo Opp. Mot. Summ. J.") (Doc. No. 108) at 8 n. 7.

#### 2. Third Factor

As to the third factor, concerning whether Moore customarily and regularly directed the work of two or more other employees, Moore does not appear to contest this fact. Moore's Opposition memorandum contains a footnote ostensibly related to this factor, but the substance of that footnote addresses another factor entirely.[2] *See* Moore Memo Opp. Mot. Summ. J. at 8 n. 7. Accordingly, the court deems this third factor satisfied for the purposes of this Motion for Summary Judgment.

#### 3. Fourth Factor

The fourth factor concerns whether Moore had the authority to hire or fire other employees or whether his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight. Moore interviewed at least ten to 15 applicants. He relayed his opinions to the Human Resources Manager, and some of the people he recommended were hired. Home Depot further argues that Moore drafted employee evaluations used in pay raise considerations, and he was authorized to issue merit badges that could result in financial awards for associates. Moore argues that a material issue of fact exists as to this factor because the ultimate discretion to hire or promote was not his own, because he was infrequently called upon to perform this function, and because Home Depot offered no evidence that his recommendations, in particular, were persuasive to the ultimate decision makers.

Some courts have indeed found that even a small number of interview recommendations resulting in a hire were sufficient to establish this fourth factor. *See Scott v. SSP America, Inc.*, No. 09–CV–4399 (RRM)(VVP), 2011 WL 1204406, *14–15 (E.D.N.Y. Mar. 29, 2011) (finding this factor satisfied when, in part, "Plaintiff's testimony about whether she personally interviewed and hired employees is inconsistent; after stating that she interviewed and hired an employee, she later denied having engaged in interviews or hiring. Plaintiff also recommended hourly employees for promotions, and her supervisor testified that at least three individuals were promoted based on Plaintiff's recommendations."); *Gellhaus v. Wal–Mart Stores, Inc.*, 769 F.Supp.2d 1071, 1082 (E.D.Tex. 2011) ("[S]ome of her recommendations regarding hiring and changes in employee status were followed, as several of her subordinates received pay raises based in part on Gellhaus's review of their performance."). However, these cases also contain supplemental evidence (usually in the form of affidavits from relevant individuals) that point towards the reviews actually having some impact on the final decision-makers.

Home Depot clearly presents a far less compelling factual scenario on which to base satisfaction of this factor as to Moore than it does with Costello. Without more,

---

**2.** Indeed, it appears that plaintiff's counsel simply copied and pasted sections of its brief related to Costello into its brief for Moore.

and given the infrequency with which Moore's hiring and promotion opinions were sought, the court cannot say that no material issue of fact exists as to this factor that permits a conclusion as a matter of law. An ultimate determination of this point, however, is irrelevant given the clear material factual issues that remain as to the second factor, discussed in the following section.

### 4. Second Factor

Home Depot argues that Moore's primary duty was management. It argues that these managerial duties include involvement with the hiring of employees, authority to recommend changes to the store schedule and approve requests to exchange shifts and arrange for coverage of a sick associate, supervision of lower-level employees within the departments he was assigned to, involvement with the evaluation and reward of employees, responsibility for ensuring that his departments were properly stocked, managing the financial performance of his department, authority to discipline associates and fill out a Discipline Notice, responsibility for ensuring the safety and security of the store, particularly when opening the store, authority to serve as manager on duty for ten to 12 hours per week, and handling customer and employee grievances.

#### a. Relative Importance of Exempt Duties

As with Costello, it is not clear from the record whether Moore's arguably managerial actions which, both sides agree, constituted less than 50 percent of Moore's work week, were critical to the success of the store. As with Costello, Home Depot offers no affidavits or evidence related to how Home Depot directly interpreted the relative importance of Moore's duties. Instead, Home Depot offers performance evaluations, the possibility of receiving bonuses, and an internal memorandum from a supervisor stating that Moore should get an $8,000 raise when he indicated he would leave the company because, "he has developed his own excel tracking sheet, which he uses weekly to drive sales and hold his staff accountable. Store 6218's AHS numbers are at the top of the district since Aron began pushing specialty. He is an overall team player and very self motivated." Def.'s 56(a)(1), Moore at ¶ 15; Moore 56(a)(2) at ¶ 15. Such evaluations have been used by courts as evidence of how companies evaluate the relative importance of employee duties. *See Mims v. Starbucks Corp.*, No. H–05–0791, 2007 WL 10369, *4 n. 6 (S.D.Tex. Jan. 2, 2007) ("The importance of Plaintiffs' managerial tasks is further evidence by the criteria used to evaluate their job performances. Plaintiffs' Performance Reviews focused on their leadership and overall store performance, *not* upon their performance of any barista tasks.") (emphasis in original). While somewhat more persuasive than the more elliptical evaluations in Costello's case, this review hardly focuses entirely on Moore's managerial responsibility.

Further, it is unclear which, if any, of Moore's managerial tasks were critical to the success of the store. Evidence as to what Moore did as MOD is even more sparse than that considered for Costello (indeed, Home Depot's Memorandum as to Moore does not refer at all to the importance of his MOD tasks). While perhaps slightly more evidence exists as to how Home Depot viewed the relative importance of Moore's managerial tasks than Costello, there are still significant factual disputes that remain such that the court cannot determine this factor as a matter of law.

#### b. Time Spent Performing Non–Exempt Work

It is undisputed that Moore spent less than 50 percent of his time on potentially exempt work. Unlike with Costello, how-

ever, Home Depot has introduced some evidence that Moore engaged in semi-frequent multi-tasking, engaging in managerial supervisory responsibilities while engaging in non-exempt work. However, how much of this activity took place is unclear from the pleadings.

Moore and Home Depot agree that Moore spent at least ten to 25 percent of his time on potentially exempt work, although Home Depot argues this amount undercounts the total time spent because it excludes time spent interviewing and handing out performance evaluations. It is clear that this factor is not determinative of Moore's primary duty one way or another, and is a factual issue best left to the jury.

### c. Freedom From Direct Supervision

As with Costello, Moore appears to have exercised discretion on a fairly regular basis and was relatively free of the kind of direct micromanaging that constitutes direct supervision. Moore had a relatively free hand to supervise employees in his departments and held them accountable for their performance. While Moore was ultimately subject to the authority of a store manager and a district manager, he operated relatively on his own when operating as MOD and interacted with lower-level employees more or less as he pleased. Home Depot has offered Moore's deposition testimony as evidence of this relative lack of supervision, and Moore offers no reason to dispute it, other than the receipt of occasional tasks and calls from supervisors. This factor weighs in favor of Home Depot.

### d. Salary

Moore's compensation, which topped out at $58,000 per year, was indeed higher than Costello's salary. Further, Moore received stock options and bonuses, although the amounts are not specified. This evidence weighs slightly more in favor of Home Depot, but consideration of Moore's comparative salary suffers the same evidentiary gaps that were present with Costello. The pay increase for Moore, while significant, is not so great that this factor can be determined as a matter of law.

Accordingly, material issues of fact exist as to whether Moore's primary duty at Home Depot was, in fact, managerial. A more fully developed record will greatly aid a jury in making an appropriate determination. For that reason, Home Depot's Motion for Summary Judgment as to Moore is denied.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment as to James Costello (Doc. No. 93) is **denied,** and Defendant's Motion for Summary Judgment as to Aron Moore (Doc. No. 98) is **denied.** The court further **lifts the stay** that had been put in place as to the Plaintiffs' Motion for Partial Summary Judgment as to the Proper Method of Calculating Overtime (Doc. No. 90). Home Depot is ordered to file its opposition brief by March 26, 2013, and reply briefs will follow the usual timeline.

**SO ORDERED.**